Petition for a Re-hearing.
[By James G. Dana.]
The Circuit Court—held by a Judge eminent for his juridical talents and extensive legal attainments—in rendering its decision in this case, expressed the following opinion, upon its record:—
“The circumstances attending the conveyance from “Phillips, the patentee, to Masterson and Miller, are cal“culated to create a strong prejudice against that transac“tion. It can, however, confer no equity on the com“plainants, who claim against, and not under, that pat“ent; and this court cannot depart from sound princi“ples, even to defeat a gross fraud. Thruston’s entry is “by no means sustained by proof, if it is not invalid on “its face. The most that the record shows, amounts on“ly to circumstances from which it may be guessed that, “possibly, a subsequent locator could, by reasonable “enquiry, have found the land. There is nothing on “which the mind can repose with that confidence, which “is necessary to a sound judicial sentence. I have, “therefore, considered it unnecessary to examine the oth“er points in the cause. It is, therefore, decreed and “ordered, that the complainants injunction be dissolved, “and the bill dismissed,” &c.
The fraud alluded to was an appalling circumstance to the present counsel, representing a party who had acquired the title of those who are accused of it. He could not fail to perceive, that its natural effect would be to bias the best balanced mind, and produce a strong inclination to defeat a claim so derived, if it could possibly be done with *238 out a very wide departure from the irrefragable rules of decision. But a perusal of the record produced, in his mind, the conviction, that no other decree than that which the Circuit Judge had rendered, could be made, consistently with those rules and the authorities by which they had long been sustained.
The Opinion recently delivered in this Court, he heard, and has read, and read again, with that predisposition to adopt its conclusions, which naturally springs from a veneration for the Court, from a sincere esteem and profound respect for its Judges, and especially, from a long continued habit of regarding the opinions and decisions of this Court, not merely as authoritative, but as—by force of their reasoning—the most satisfactory evidences of the law. Yet, it must be confessed, that the Opinion and decision now under consideration, have not had that effect. Nor has the counsel been able to perceive how its conclusions can be reconciled with certain former Opinions of the Court of Appeals of Kentucky, which have been followed by many subsequent cases, in which the most important rights of property were involved.
The law under which Charles Minn Thruston attempted to appropriate the vast body of land including the whole, or some part, of that now in controversy, required him “to direct the location thereof so specially and precisely “as that others might be enabled, with certainty, to lo“cate other warrants on the adjacent residuum.”
If the calls in his entry, are not “in themselves precise and unequivocal,” the entry cannot be sustained. Hughes’ R. 177.
“Land warrants of every description were required to “be located so specially and precisely, as that others “ might be enabled, with certainty, to locate other war“rants on the adjacent residuum.” Pr. Dec. 67.
“The law requires that the certificate [or entry] shall “ contain a special location, describing as accurately as “may be, the land intended to be included. And its “reference to external objects must be such, as to enable “subsequent locators, with reasonable certainty, to ascer"tain and appropriate the adjacent residuum.” 7 Dana, 142.
*239 The same rule is recognized and established in scores of intermediate cases.
Thruston’s Entry is recited in the Opinion. It need not be repeated here. Does it conform to the rule above laid down? That question, this Court is most respectfully asked to hear re-argued. And some suggestions of the grounds, which would be relied on in a re-argument, follow.
It will not be contended that the entry must be such, or could be so made, that a subsequent locator, by merely taking the entry in his hand, could, with no other guide, and unaided, find the land described in it. But it must be such that he could, by inspection of the entry, and enquiries in the neighborhood in which he is about to make a location, ascertain, with certainty, whether the previously appropriated land is there, and if there, its precise position, so that he may avoid it in his own location, without much difficulty.
Let us see what difficulties and embarrassments the subsequent locator would inevitably have to encounter, in endeavoring to find and avoid the land in Thruston’s Entry.
His first enquiry would be for Woolper’s creek. But nobody at the place where the land is said to lie, nobody in that neighborhood, nobody in the now state of Kentucky, could, when that entry was made, or at any time to within ten or fifteen years afterwards, have given him any information of a creek of that name. Among the several witnesses who were examined on this point, not a single one was found, who knew Woolper’s creek by that name, until more than ten years after the date of Thruston’s Entry. “Some of the witnesses”—nay, every one of them who speaks of the creek, declares, that it was notorious by the name of Stony creek, when that entry was made, before and after, not only in the immediate neighborhood, but, at least, as far off as Bryant’s station.
But it is intimated that the creek may have had two different names: that it was called Woolper’s creek by some, several years before Thruston’s entry was made, as well as more recently. And two old entries are referred to, one made in 1775, the other in 1784, which call *240 for the stream in question, by the name of Woolper; and it is supposed that, ‘‘from these facts, it is apparent that before and about the date of the entry in contest, the stream upon which it lies, was sometimes called and known by the name of Woolper.” That may have been the case in Virginia; for it should be remembered that these entries were in Virginia; distant from the land; separated from it, by “the wilderness,” and some six hundred miles of difficult and dangerous way. Did reasonable diligence require that the subsequent locator should travel that distance, through such a country, to see what names were given to creeks, in the entries recorded in Richmond?
Finding nobody in the vicinity of the Big Miami, or in that quarter of Kentucky, who could give him any account of Woolper’s creek, the subsequent locator must proceed to the next call in the entry—“the Big Miami.” And this river, it is agreed on all hands, was notorious-enough, at and before the date of the entry. And the conclusion is irresistible, that the river itself—its course, and meanderings, at least for a considerable distance up, were as well known as the mouth. The call, it must be recollected, is for a point on a creek, “about 8 miles below the Big Miami;” and it is assumed (in the Opinion) that the enquirer would ‘‘set out to find the mouth of the latter stream, as the point approaching, in all reasonable likelihood, nearest to the mouth of Woolper.” But, if our maps are tolerably accurate, the enquirer who knew where to find the mouth of the Big Miami, would know, also, that, a short distance above the mouth, that river has a large bend, extending down, and approaching near the Ohio, several miles below its mouth, and that an object eight miles below the exterior of that bend, is some miles more than eight below the mouth. And the enquirer, seeing that the call in the entry is not for the mouth, has first to settle the question, whether he shall go there to find his starting point, or go to that part of the river which is nearest to his next point. But, if he can settle this question to his own satisfaction, new, and very serious, difficulties will present themselves before he starts. Let us suppose him to be at the mouth, as the *241 Court seem to think that would bo most natural. Then, be has to determine whether he shall follow the meanders of the Ohio, down stream, eight miles, and stop there to look for the creek; or take a straight course, departing from the Ohio, and striking it again, at the end of eight miles, straight line, and two or three miles below where the eight miles by the meanders would be out; or whether he should diverge from the river, so as to be a mile and a half from it, after traveling eight miles.
If he selected the first—following the meanders of the river, when he had got about eight miles, (viz. 8 miles 90 poles,) he would find himself at the mouth of a creek; and that, for a moment, might be cheering and encouraging; but his joy would be short lived; for, if he did not know himself, every body in those parts would tell him that, that was not Woolper, but Stony creek—well known to every body in that vicinity by that name, and no other. And he must at once conclude, that he had ‘guessed” wrong, when he chose to follow the meanders of the Ohio. True, our Court have decided that in computing distances, from point to point, upon the Ohio, it is most proper, because most natural, to follow the meanders. But our enquirer had not the benefit of that light. The decisions were long after the time when we are supposing his search to have been made.
Foiled in his attempt to find the object of his search by pursuing the meanders, let him go back and take the straight course—either aiming to strike the Ohio, at the distance of eight miles, or diverging, to strike a point on a creek a mile and a hall from the Ohio. In the first of these two modes, we know by the proof, that he would strike what is now Woolper’s creek, six and a quarter miles from the mouth of the Miami. In the other, he would probably reach one of its bends about five miles from the mouth of tho Miami. (See the platt.) And proceeding on, by either course, about eight miles below the mouth of the Miami, he would como to a creek.
Let it not be thought that I have overlooked that part of the Opinion which says—“there is no stream for several miles below and above the mouth of Woolper, running into the Ohio, of such size as to entitle it to the de *242 nomination of a creek.” Such, indeed, was the argument at the bar. But, if, by “several miles,” the Court mean more than two, the position rests on the argument of counsel, not upon the evidence. The deposition of Lewis Webb, the surveyor, says “Woolper’s creek does empty into the Ohio, on the Kentucky side, and it is the only creek, after passing Taylor’s creek, at about two miles below the mouth of the Big Miami, within the above distances [8 miles, 90 poles—6¼ miles,] and there is no creek or branch of any considerable size, for about two miles below.” And, by necessary implication, there is one about two miles below; and that is about eight miles, straight line, from the mouth of the Big Miami. And herewith agrees the old Map of Kentucky, on which there is such a stream laid down, (a creek,) in about that position. This creek is twice called for, as “a creek,” in Thruslon’s survey, and as being crossed by the lower line, and again by the back line, of that survey.
We are now upon a creek eight miles and a quarter, or thereabouts—straight line, below the mouth of the Big Miami—it being, by the proof, six and a quarter from the mouth of the Miami to Woolper, and two from thence, to the next creek. And having found that about eight miles from the Miami, by the meanders of the Ohio, brings us to Stony creek, and not to Woolper, here, on the next creek, two miles below Stony, we must find Thruston’s entry—unless we are met with some new difficulty—such for example, as finding that we are now, not upon Woolper, but upon Willoughby’s creek. If that should be the case—having been thus far altogether unsuccessful in our efforts to find Woolper, perhaps we had better go back to the big bend of the Miami, and try where eight miles from thence will land us. Or shall we choose arbitrarily, and without guide or authority, which of the two creeks that we have found, we will have for Woolper? Then, without any adequate reason for it, existing any where in the neighborhood, at any time within ten years after the date of Thruston’s entry, we will, per force, take the creek now called Woolper.
With all these difficulties, doubts, uncertainties, perplexities—inevitably to be encountered by the subsequent *243 locator—is it possible that the entry can be sustained? Yet, after all this groping in the dark, and erroneous “guessing,” and having, at last, fixed upon a creek as Woolper's, which was known by another, and not by that, name—we have only arrived at the point—the mouth of the creek—which, to this Court, “has presented most difficulty.”
Shall the point where Thruston’s survey shall be commenced—“about 1½ miles from the mouth of the creek,” be ascertained by measuring up the creek along its meanders—and is very crooked; or shall it be ascertained by extending a direct line 1½ miles, from the mouth, to a point upon the creek above? And this was an additional difficulty, which the subsequent locator had to encounter, unaided by the subsequent decisions of the courts of this country—none of which were made, upon this point, until long after the date of this entry. 4 Monroe, 505-6.
But this question is highly important, in another point of view, in this case: in one mode of surveying the entry, it covers the whole of the 500 acres in controversy; in the other, about half of it; in the mode directed in the opinion, it includes the whole, it is said, and divers farms, not here involved, besides; whose owners little dream of the trouble that’s coming.
It has, as the court suggests, been settled and is considered as well established that “when a road or trace is mentioned, and a distance between two objects on that road or trace, as directory to the beginning, that distance shall be taken along the meanders.” Index to 1 Bibb, 632, §8.
It has also, been decided that when distance from point to point, upon the Ohio river, is to be ascertained, and the mode of measurement is not indicated, it should be by the meanders. The same rule would, of course, be adopted, in regard to the Mississippi, as a general rule; and perhaps it might be applied to some others of our rivers. But where a question arose whether a distance indicated, down the Kentucky river, should be ascertained by adhering to the meanders, or by taking a straight *244 course, it was considered as a debatable, open, question, and was not decided by the court.
But are these rules for roads and rivers, applicable to creeks? The stream in question is but a creek, and a creek of “the second class”—“there are more streams called creeks, smaller than it is, than there are larger”—but some larger it seems. Depositions of Col. Cave Johnson and of J. H. Craig.
Let us advert to the decisions on this point.
James Patton made an entry, in 1782, on a treasury warrant, No. &c. “about two miles up the first branch above the eighteen mile creek, beginning” &c. A point two miles and about fifty poles, on a straight line, from the Ohio river, was held to be the beginning of the survey. Caldwell vs Strother &c. 2 Dana, 440-1.
“The Miller enters 2000 acres of land on T. W. &c. beginning on the creek, about two miles below Estill’s battle ground” &c.—“The survey begins on the creek rather more than two miles on a straight line, from the spot where, according to the proof, Capt. Estill fell. But if the beginning be fixed at the precise distance of two miles, we have no doubt the survey will include the land in contest, or most of it—“About” two miles must be considered as importing, according to established construction, exactly two-miles.”—No doubt intimated as to the propriety of the straight line. Conley’s Hs. vs Chiles, 5 J. J. Mar. 304.
Entry. “16 Dec. 1782. J. Watson enters 1200 acres of land, on a branch of Brashears’ creek, beginning half a mile below a lick known by the name of Cany lick, and running up the west side of the creek about half a mile above the lick, then turning an east course across the creek for quantity.”
“Also 1200 acres, beginning on the north corner of the west side of his last entry, and running up the west side of the creek about one and a half miles, then turning an east course for quantity.”
Per Cur. “The first entry in the chain of entries (viz. the first of the above) should begin on the west bank of the creek, one half mile below the lick, and thence extend up the west side of the creek, with its me *245 anders, to a point one half mile above the lick, on a direct line, and from thence an east course for quantity.”—“The 2nd entry should begin at the half mile point on the creek above the lick, and extend up the creek, with the meanders on the west side, 1½ mile, when reduced lo a straight line, and thence east for quantity. Banta’s heirs vs Calhoon. 2 Mar. 169, 170.
An Entry—“On Rough Creek”—this is a large creek, navigable, and used for navigation, at times, and twenty times as big as Stony, or Woolper—“about one mile below the mouth of Short creek, beginning 100 poles above the falls” &c.
Per Cur. The call for the falls and the mouth of short creek, taken together, satisfactorily show the place of location. The claim should begin 100 poles on a direct line above the falls.” &c.
“Entries—rules and tests for trying,” in the Index to 1 Bibb—“7. Distances, on watercourses, to ascertain the beginning, or to regulate the lengths or bearings of the lines of surveys, shall be taken on it, reduced to a right line, and not by the meanders. Green vs Watson 107-8. Craig vs Hawkins, 53.”
Entry—“On a branch of Licking called Mill creek 1¼ miles below McFall” &c.—the distance of 1¼ mile taken to be on a direct line. 2 Bibb, 249-50. See also, same vol. 153—where it is said—“It indeed is not very probable that the distance along the meanders of the watercourse (14 or 15 miles—either Hinkson’s fork of Licking, or Townsend’s run—uncertain which,) was intended, because it is believed that it never was usual to travel with the meanders of a small stream, to ascertain the distance from one object to another.”
Entry—“On Brashears’ creek, to begin one mile from the mouth thereof, and to run up the same,” &c.—Note, that Brashears’ creek—rising near the northern line of Shelby, and running across that county, and about two thirds of Spencer, falls into Salt river—appears by the map to be about five times as large as Woolper, which heads about the middle of Boone, and running half way across that county, falls into the Ohio.
Per Cur. “It is made a question whether the survey *246 upon this entry, should begin a mile from the mouth of the creek measuring along its meanders, or on a straight line? It is settled, that where distance is given on a road, it ought to be ascertained by the windings of the road; but it has also, long since been settled, that where a distance is given on a stream like the present, which presents no impassable obstructions, the distance should be understood to be on a straight line.” Carland &c. vs Rowland, 3 Bibb, 127.
On the same creek—“about four miles from the mouth.”—
Per Cur. “In making this examination (of a subsequent locator) according to the uniform course of decisions, the distance mentioned from the mouth of the branch should be estimated on a direct line, and not with the meanders of the creek.” Stephens vs Heddin, 4 Bibb, 108.
“Lee’s entry calls to begin, “about two miles up said branch” and to extend up, on both sides, for quantity. The point of beginning must, by construction, be fixed at two miles up the creek. But whether this distance shall be obtained by admeasurement with the meanders of the creek, or on a direct and the most-practicable route of passing, is a question necessary to be decided. It has been settled by repeated decisions of this court, that a direct course, or the nearest possible rout, is the proper rule of construction upon calls like the present, for the ascertainment of distances by land, where the entry does not clearly require the meanders of the creek to be pursued.” Morrison vs Coghill’s heirs, 4 Bibb, 382.
The case of Johnson &c. vs Brown &c. (Pr. dec. 62) in which the same rule of decision was adopted—has been mentioned by the court, as furnishing an example of one of the exceptions to the general rule settled “by the earlier decisions”—to which those above referred to seem to have conformed: viz. “that where insuperable obstacles to running a straight line, intervene, the rule may be departed from, and the meanders of the stream pursued.” There was no case to be found till now, where a practicle operation was given to such an exception. But supposing the exceptions to have existed, and that there *247 might be cases where effect should be given to them—does a momentary rush of the waters of the Ohio, up Woolper creek, in time of a flood, constitute such “an impassable obstruction, lying in the direct course” up the stream, as was intended by the Judges in the case of Johnson &c. vs Brown &c. Such may be the condition of the creek, for two or three days at a time, perhaps once in two years, perhaps twice or thrice in one year. Such exceptions would destroy the rule entirely, for there is not a creek in the country that is not sometimes impassable.
It is intimated that the season of the year at which the entry was made—as whether it was in the season of high waters, or low waters, should have some influence, if not a determinate one, upon the question whether the meanders of the creek, or the straight line, from the mouth, shall be taken, to ascertain the beginning of the entry! Some of the witnesses in this case were asked whether. Woolper creek, within a mile and a half of its mouth, was not difficult to cross, in March and April, They answered that it was so, generally, or occasionally, at that season of the year. And this Court, assuming that Thruston’s entry was made in the spring of the year, and that Woolper creek was. then impassable, and that a straight line could not be run a mile and a half, parallel with its general course, upward, without crossing it at least twice, have come to the conclusion, that, therefore, Thruston’s intention was, that the meanders should be pursued, in going from the mouth of the creek to the beginning of his entry. But what if another creek falls into Woolper, near its mouth, and the Ohio backs up there too, and it is impassable—how then?
But a little attention to facts, will put all this high-water reasoning aside. The entry was made on the 22d of May, 1780; and not in the season of Spring floods; and none of the proof about the Spring floods and the waters of the Ohio in Woolper, rendering it difficult to be passed in March and April, is relevant.
It is said—“there can be no fixed rule upon this subject applicable to all cases. The intention of the locator must be arrived, at by construction, from the calls of *248 his entry,” &c. But are there no fixed rules of construction? no prescribed mode for the ascertainment of his intention? Do the cases above cited settle nothing of this sort? I had supposed that the rules on this subject, were at least as well settled, as the rules concerning the constrution of wills, of contracts, or of statutes.
In the old case of Johnson &c. vs Brown &c. above mentioned, the Court say—“It is conceived, that, in determining distances by land, to follow. the meanders of water courses, is too rare and ridiculous to authorize a general rule for the construction of entries.” The term ‘ridiculous’ is rather a strong one: I certainly do not adopt it in reference to the opinion which has been delivered in this case. The court, when they used the expression, may have been thinking of some such case as the following.—Suppose an entry for 1000 acres of land, to lie on Stony creek, beginning one mile above the mouth of the creek: there, a line to be drawn, across the creek, east and west, equally on both sides; and a parrallel line to be drawn through the mouth of the creek, of sufficient length to include the quantity, in a square or oblong form. Then, suppose the general course of the creek to be north and south; but that when it approaches within half a mile of the Ohio, running north, it turns towards the east, and runs eastward for some two miles, then winds round to the north, and to the west, and keeping a due west course for the last mile, falls into the Ohio, below the elbow, within which it has been meandering. Now, let the entry be surveyed according to the rule in this case of Thruston and Masterson. In the first place, the surveyor is to follow the meanders of the creek one mile, and there draw an east and west line of sufficient length; he is then to return to the mouth of the creek, and run another. How long must these lines be, to include the quantity? Why, he may extend each of them, east and west, until the ends meet on the oppposite side of the globe, and never get a foot of land: for the two lines will be together.
Upon these two important points—the validity of Thruslon’s Entry, and, if its invalidity shall not be demonstrated, the mode of surveying it—the person who now *249 claims the lower half of Phillips’ preemption, and holds the most of it, desires to have another opportunity of being heard in defence of his possessions; when, he hopes that, by the aid of more able and efficient counsel or otherwise, a different result may be produced: with that view his present counsel, most respectfully, but earnestly and zealously, solicits a rehearing of the cause.
The Court is also most respectfully solicited to review the evidence, upon which it assumes, that Sebree first entered upon the land in controversy under the title of the Thrustons; and consider again whether it can he deemed sufficient to outweigh the strong opposing facts—that the complainants themselves, in their original bill, allege that Sebree entered under Phillips’ title, and adversely to them; that Chambers, in his answer, alleges the same fact, and is supported by the testimony of five or six witnesses, conducing to the same conclusion; and that Sebree instituted a writ of forcible detainer against one of his tenants, an ejectment against another, upon the express ground, that, though they entered under him and his claim of Phillips’ preemption, they had attorned to the Thrustons; and succeeded in both cases, and thus, in effect, obtained two solemn decisions, that he himself entered and held adversely to the Thrustons, not as co-tenant with them.
The effect of the conveyance from Charles Minn Thrust ton to three of his sons, may not be unworthy of some further consideration. Supposing that the grantor had no other lands in the western country, besides the 8000 acres in Boone—and it should be so considered in this case, in which, there is no intimation save the deed, that he had any more—did that conveyance pass his entire interest, legal or equitable, in the tract? The legal title having vested in the grantees of the deed, as soon as the patent issued to their grantor—that is to say, for the whole, or as much as their deed embrace—if Charles M. Thruston had then selected his reserved thousand acres, would he have had no title to it, without a reconveyance from, his grantees? Was not the effect of the deed rather to convey an undivided seven eighths of the 8000 acres; making the grantor and grantees tenants in common—the *250 former having an interest of an eighth, the latter of seven eighths of the land?
If this was the effect of the deed—and it seems to me that it must have been—then nothing appearing to the contrary, an undivided eighth part of the land embraced by Thruston’s patent passed to his heirs, at his death, and they were necessary parties to this controversy.
But if, on the other hand, the legal title to all the grantor’s lands in the western country, passed by that deed, and the effect of the reservation, was to authorize him to reclaim one thousand acres of the same land, whenever he might choose to select it—it was incumbent on him to make the selection in a reasonable time; and as more than forty years from the date of that deed, had elapsed when the complainants filed their bill, it should be presumed that the selection had been made before that time. The reservation—if the whole legal title passed by the deed—was, at least, equal to a covenant to reconvey one thousand acres; and, as that covenant was in the deed, all subsequent purchasers who had a knowledge of the deed, were affected with notice of the equity conferred by the covenant. And, as the complainants, before they can have any right to disturb the defendants in their possession, or deprive them of the benefit of their judgment for possession, must show that they have a clear right, in law or equity, to the land they claim—they should be required to show what land had been selected for the reservation, and thus demonstrate that it was not the land in controversy.
The deed by which the complainants claim to have derived a title to the land in controversy from Charles Minn Thruston, escapes the operation of the Virginia, champerty act, by the opinion delivered, because the patent was not issued when the deed was made; the title was in entry only; entries were assignable by the laws of Virginia, and the deed, as to this land, was but an assignment of the entry—a lawful assignment, and was, therefore, not champertous. Yet, I must be permitted, this once more, to contend, that—whether it passes the “legal title,” or is but “an assignment”—it is so far champertous, as to be utterly void, and therefore passed *251 nothing, by grant, or by assignment, in law or in equity,
If it did not pass the legal title to the eight thousand acres entry of Thruston, it did pass, or purport to pass, the legal title to other lands. Its language is, “all my “deeded and undeeded lands, and all manner of loca-"tions, entries and preemptions, and all my right, title, “and real interest of, in, or concerning the same, of any "nature whatever, on the western waters, and on the west “side of the Alleghany mountains, with the express res"ervation of one thousand acres, &c.” So far as it attempted to pass deeded lands, it was clearly no assignment of an entry, but an attempted conveyance, and the consequences cannot be better described, than in the eloquent and impressive language used in the case of Wilhite and Roberts, by the judge who read the opinion in this case:—
“But champerty(he says)is the most odious species of maintenance, and was an offence at common law, and has been denounced by various penal statutes, in aid of the common law. It has always been regarded as an offence against the peace of society, the administration of impartial justice, and tending to the encouragement of litigation, and the oppression of the weak. And the courts have been uniformly vigilant, where the peace and quietude and justice of the country are regarded, not only in enforcing their penalties, but in declaring void all contracts made in derogation of their provisions. If the contract contained any stipulation on its face, in derogation of their provisions, we should find no difficulty in treating it as a nullity, and refusing all aid from the law land the courts, in enforcing it, or any stipulation in it, however lawful. It is laid down in Chitty on Contracts, 229, “That if any part of the consideration or subject matter of a contract, be contrary to a statute, the whole shall be invalid; but if only a portion of an agreement be contrary to the common law, the invalid part, if it can be separated from the rest, shall be rejected, and the remainder of the contract shall be established. A statute is like a tyrant, when he comes, he makes all void. And in the case of Bartlett and Viner, Carth. 252; Holt, C. J. observes: “Every contract made for or about any matter, *252 or thing which is prohibited, and made unlawful by any statute, is a void contract.”
December 9.
If we shall be so unfortunate as not to succeed in obtaining the rehearing prayed, we shall nevertheless hope that, there may be some modification of the decree, to obviate the following difficulty.
Mr. Chambers states that about fifty acres of the lower corner of Phillips’ preemption is covered by Fishback and Morgan’s Entry; that he purchased this 50 acres, at a high price, of Catlett, who held under the claim of F. and M. by title of record; and that it has been in constant, uninterrupted, possession under that claim for more than forty years. This place he has never considered in controversy, though it is within Phillips’ preemption, and, it is presumed, will be included in Thruston’s entry and patent, as the Court have now directed that they be surveyed. There would certainly be great injustice in compelling Chambers to surrender Ms whole title, and the possession of this parcel, which he holds under Fishback and Morgan, to the complainants—merely because he has acquired Masterson’s adverse claim to it.

J. G. Dana.

Additional Opinion—by Judge Ewing.
Impressed with the important interests involved in the controversy, and urged by the earnest solicitation of the counsel for the defendants, we have yielded to a re-argument of this case. And after the most careful re-examination of the record, aided by all the lights, which have been thrown around the subject, we are constrained to adhere to the opinion heretofore expressed.
The intention of the locator, fairly deducible from the face of his entry, applied to the objects found upon the ground, at the time when the entry was made, is the governing principle in the construction of all entries; and such intention thus fairly deducible, subsequent locators have, by the whole course of decisions, been required to know. Or that construction which a reasonable man *253 would put upon the calls of an entry, taken in connection with the objects found on the ground, a subsequent locator is presumed and required to put upon it. And to that construction he has been made to conform, in the appropriation of the vacant residuum. The way that was usually traveled, or was most likely to have been traveled, in going from one object to another, is the way, it is to be presumed, that the distance was measured. And this is the principle and spirit of all the decisions of this Court, ancient and modern. Hence, a road or trace, however crooked, is to be measured by its meanders, because it was the way of travel, and the presumed way by which the distance called for was measured. So, the Ohio is to be measured by its meanders, because that was the most usual way of travel. But as a small, crooked creek or branch, might have been crossed on horseback, or on foot, whenever it was approached, without difficulty or obstruction, it is to be presumed that it was so crossed in passing from one object to another upon it, in the straightest direction that could be taken, and a right line has been assumed as the way which was traveled, and consequently, the way by which the distance called for was measured. But if obstructions intervene, such as cannot be passed in the usual modes of traveling, on a right line, it cannot be presumed that they were passed, or that that was the way traveled; and consequently, it will not be presumed that the distance was taken, or meant to be taken, in that way. Hence in the case of Johnson vs Brown, &c. referred to in the former opinion, and Garland and Basey vs Rowland, 3 Bibb, 127, it is said—“where distance is called for on a small stream which presents no impassable obstructions, the distance is to be understood on a straight line.”
It may be fairly implied, from the exception here given, that where those impassable obstructions exist, that the rule does not hold, but a different way of measurement, to ascertain the distance intended, may be resorted to. Why? Because the presumption cannot he indulged, in such a state of case, that the right line was the way traveled and measured by the locator; nor are we to understand by the terms “impassible obstructions," *254 that the Court meant such obstructions as were impossible to be overcome, but such as would oppose serious obstacles to a passage in that route, or such as, from the difficulties of passing them, would turn the locator aside to a different route, more convenient and practicable according to the usual modes of travel, when the entry was made.
The witnesses in the case before us, were only interrogated as to the condition of Woolper during the months of March and April, and they concur in stating, that it was, in those months, a deep stream, and impassible except on rafts, for a mile and a half up from the mouth, by reason of the back water from the Ohio, with steep and difficult banks on the lower side. Now we must presume, from our knowledge of the history of the Ohio, and of its spring floods, that, if the back water was thrown back a mile and a half in Woolper, generally in the mouth of March and April; so as to render the stream impassible except on rafts, for that distance up, that it Would not have run down so early thereafter as the 22d of May, so as not to have left the back water in the stream at least as high up, as the first bend from tho mouth, and thereby render it impassable as high up at least as that point. If so, as the stream on a right line would have to be crossed twice at that bend, an obstruction intervenes, which repels the presumption that the right line was adopted. That cannot be presumed to be the way the locator traveled in passing from the mouth, to his point of beginning on the creek. And if the right line be rejected, by reason of the obstructions and difficulties of passage, there being no road or other guide but the creek itself, it must be presumed that the meanders pf the creek were followed and measured, in ascertaining the distance called for in the entry.
Besides, it can scarcely be presumed, in those wild and uncultivated times, when nearly the whole country was a wilderness, that the hardy pioneer, after he had, with his pole or rope chain, measured the Ohio by its meanders, from a point opposite the Big Miami, down to the mouth of Woolper, as the means of obtaining proper calls for his entry, would, when he arrived at the mouth of that stream, notwithstanding he finds it deep and impassable, *255 with high, cliffs on the opposite side, drop his pole or rope chain, and varying from his mode of measurement, run off to the nearest station, to get a compass and surveyor, to have a right line run, and measured from the mouth to the object of beginning. As he meandered the Ohio—the mode of measurement to which he is held by the decisions—he would most likely have meandered the deep and impassable creek, Woolper. And as subsequent locators are held to presume that he meandered the Ohio, they will he held to presume, also, that he meandered Woolper.
To enable a party to protect himself in the possession of land, under the seven years law, he must have a title, legal or equitable; derived from the com’th.
A purchaser of land, under execution, has no right to induce the tenants in possession to attorn to him. A possession gained in that way, is no better against an adversary claim, than that of the ex’on debtor was.
A cause which was once reversed necessary parties, who were designated in the opinion then delivered, being again here—the court refuses to remand it for want of other parties, not then noticed—especially as those before the court cannot b
We still believe that Sebree acquired a joint interest in the Thrustons’ claim, and was in possession of it, claiming to hold under their claim, and as co-tenant with them, before he set up claim under Phillips, and could not consistent with his fidelity to them, enter upon and set up an adversary claim under Phillips, so as to defeat or bar them of their rights, as an adverse possessor, under the statutes of champerty.
Nor can Chambers protect himself under the statute of limitation of seven years. He has shown no color of title, legal or equitable, in Sebree, to Phillips’ claim, and could have derived none by his purchase of his interest. Besides, having come in under Sebree, he could occupy do better condition with respect to the claim of Thruston, than he did.
And though he purchased Sebree’s interest under execution, he had no right to obtain the possession by procuring Sebree’s tenants to attorn to him. And having done so, though he may have acquired title by his purchase under execution, he occupies no better condition in relation to the claim of the Thrustons, than Sebree himself, or his tenants, did. His purchase of the pretended title of Masterson, took place only a short time before he was made a defendant in this suit.
The various questions raised by the counsel, as to the necessity of other parties will not be noticed.
For as this Court, when the case was formerly here pointed out those parties upon the objections, then taken, *256 which they deemed necessary, we will not now send the case back upon a suggestion of other necessary parties not then noticed, especially when the rights of those who are before the Court, can in no way be affected injuriously by the failure to bring others, who might in mere form be deemed proper parties, but whose rights, if they have any in the subject of controversy, if at all effected; are beneficially affected, by the result of the decree.
Tho’ a deed may in terms convey all the grantor’s deeded and undeeded lands, all his right, title, &c.—to lands within a certain district — it is incumbent upon party who alleges that the deed is champerlous under the act of 1786, to show that the grantor had the legal title to some of the land embraced by the deed, and that it is not a mere assignment of entries; and that the gran tor had not been in possession of the land conveyed so long as a year. And—Query—whether the constructive possession which a patent confers,is not sufficient to fulfil the requisitions ofthe cham perty act of ’86.
A conveyance of land to which the grantor has only an inchoate title, as an entry, will operate as an assignment of the inchoate title, or entry, until the patent issues; and then and thenceforth,have the force and effect of a conveyance of the legal title.
Nor has any thing, that has been offered in argument, changed our opinions as to the effect and operation of the deed from C. M. Thruston to his three sons, Buckner, &c. Though other lands seem to have been embraced, and to have passed by it, it is not shown in this record, that any other than the tract in contest did pass, or that the grantor owned or had a Claim legal or equitable, to any other, and if he had, it is not shown, they were not held by entry also. And if held by complete legal title, it does not appear that he had not possessed the same for the time prescribed by the statute of 1786 against champerty. Besides, it is not conceded that, if there were no adverse, actual possession, that a constructive possession by patent would not take the case out of the statute.
We perceive no inconsistency id the idea of making the deed of C. M. Thruston operate only as an assignment of the inchoate title or entry when it was made, and in giving to it the force and effect of a complete legal title after the patent issued. It is a conveyance in form, and contains a warranty against himself and heirs. And if such a conveyance operates by estoppel, to pass a subsequently acquired title, which is well established,a fortiori, should it operate to pass the legal title, so soon as the patent issues, though he had no other than an inchoate title when the deed was executed.
We have modified the decretal order in the former opinion, so as to make the release apply to the claim of Phillips, which is the only claim set rip by the defendants ; but cannot in advance, determine what effect such release and surrender of possession will have upon any other claim held by Chambers, and which he failed to set up in his answer. The former opinion, with this modification, must stand.